Trevor Quirk (SBN 241626)
tmq@qlflaw.com
QUIRK LAW FIRM LLP
877 South Victoria Avenue, Suite 111
Ventura, CA 93003
Telephone: (805) 620-7645

William D. Marler, WSBA #17233 (*pro hac vice* forthcoming)
bmarler@marlerclark.com
MARLER CLARK INC., PS
180 Olympic Drive S.E.
Bainbridge Island, WA 98110
Telephone: (206) 346-1888
Fax: (206) 346-1898

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| AMY AND ANTHONY MAZZIOTTI, individually and on behalf of their minor child, H.M., <br><br> Plaintiffs, <br><br> v. <br><br> BYHEART, INC., a Delaware Corporation, and TARGET CORPORATION, a Minnesota corporation, <br><br> Defendants. | Case No.: <br><br> **COMPLAINT** <br><br> <u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiffs, by and through their undersigned counsel, and for their claims against the Defendants, allege as follows:

## **PARTIES**

1. Plaintiffs AMY AND ANTHONY MAZZIOTTI, individually and on behalf of their minor child, H.M., reside in Burbank, Los Angeles County, California.

**COMPLAINT**

1

2. Defendant BYHEART, INC. is a corporation organized and existing under the laws of Delaware. It conducts business throughout the United States, including in the State of California. Its principal place of business is at 131 Varick Street, 11th Floor, New York, NY 10013.

3. Defendant TARGET CORPORATION is a publicly traded, for-profit corporation organized and existing under the laws of Minnesota. It conducts business throughout the United States, including in the State of California. One of its California state retail locations is 1800 Empire Avenue, Burbank, CA 91504. Its principal place of business is 1000 Nicollet Mall, Minneapolis, MN 55403.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. The amount in controversy far exceeds $75,000 exclusive of interests and costs, and this is an action by individual Plaintiffs against Defendants with their principal places of business in other states.

5. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and because the Defendants were subject to personal jurisdiction in this judicial district at the time of the commencement of the action.

## FACTUAL ALLEGATIONS

### The ByHeart Botulism Outbreak

6. The United States Food and Drug Administration (FDA) and the Centers for Disease Control and Prevention (CDC), in collaboration with the California Department of Public Health (CDPH), Infant Botulism Treatment and Prevention Program (IBTPP), and other state and local partners, continue to investigate a multistate outbreak of infant botulism.

Epidemiologic and laboratory data show that ByHeart Whole Nutrition infant formula is the source of this multistate outbreak of infant botulism.

7. As of December 17, 2025, this outbreak includes fifty-one infants with suspected or confirmed infant botulism from nineteen states – Arizona 5, California 12, Idaho 2, Illinois 2, Kentucky 1, Massachusetts 2, Maine 1, Michigan 1, Minnesota 3, North Carolina 2, New Jersey 1, Ohio 1, Oregon 4, Pennsylvania 1, Rhode Island 1, Texas 8, Virginia 1, Washington 2, and Wisconsin 1.



8. Per the FDA's December 17, 2025 Update: "All ByHeart infant formula products have been recalled, and these products should not be available for sale in stores or online. This includes all formula cans and single-serve 'anywhere pack' sticks."

9. On December 12, 2025, FDA sent warning letters to four major retailers, including Target Corporation, for failing to remove recalled ByHeart infant formula from their store shelves despite being notified of the recall.

---

**COMPLAINT**

3

10. On December 15, 2025, FDA issued a press release and reminded industry about its legal duties regarding food recalls under the Federal Food Drug and Cosmetic Act. FDA asked companies to follow best practices when carrying out recalls.

11. Despite these repeated notifications, the FDA has received reports that recalled formula is still being found on store shelves in multiple states, including at multiple Walmart, Target, and Kroger locations, and at one or more Sprouts Organic Market, Safeway, Jewel-Osco, Shaw's, and Star Market locations.

12. Specifically, on November 19, 2025, the FDA held a call with Defendant Target Corporation to discuss the ineffectiveness of the recall within its stores. During this discussion, FDA requested actions Target Corporation was prepared to implement to ensure recalled product was no longer available for purchase at Target stores nationwide.

13. Despite follow-up emails from the FDA on November 20, 21, 24, and 26, 2025 and December 1, 3, and 8, 2025, Target Corporation did not provide FDA with any information demonstrating that corrective actions to effectuate the recall were implemented throughout Target Corporation to prevent adulterated food from being received in interstate commerce and subsequently offered for sale.

14. The inadequacy of Target Corporation's recall response was further demonstrated on November 20, 2025, when Arkansas state partners observed ByHeart Whole Nutrition Infant Formula single-serve "anywhere pack" sticks on a Target store shelf with promotional "Sale!" signage offering a $2.00 discount on the recalled formula from November 16 to November 22, 2025. This observation indicates not only Target's failure to remove recalled infant formula from store shelves, but the *active promotion and*

*discounted sale* of recalled infant formula product implicated in an infant botulism outbreak.

15. Laboratory confirmation for some cases is ongoing. Illnesses started on dates ranging from December 24, 2023 to December 1, 2025. All 51 infants were hospitalized. No deaths have been reported to date. The infants range in age from sixteen to 264 days and 22 (43%) are female.



This chart shows when 51 infants in this infant botulism outbreak got sick.

16. As part of this investigation, product sampling and testing is being conducted by FDA, CDC, state partners, and ByHeart. As of December 3, 2025, six samples of ByHeart infant formula have tested positive for *Clostridium botulinum.* Detection of *Clostridium botulinum* in infant formula is difficult, and a negative test result does not rule out the presence of the bacteria in the product.

| Sample Collected/Analyzed by | Product | Test Result | Toxin Type |
|---|---|---|---|
| CDPH | Opened container of ByHeart Infant Formula (Batch No. 251131P2) | Positive | Type A |
| ByHeart | ByHeart Infant Formula (Batch/Batches Not Reported) | Positive | Type A |
| ByHeart | ByHeart Infant Formula (Batch/Batches Not Reported) | Positive | Type A |
| ByHeart | ByHeart Infant Formula (Batch/Batches Not Reported) | Positive | Type A |
| ByHeart | ByHeart Infant Formula (Batch/Batches Not Reported) | Positive | Type A |
| ByHeart | ByHeart Infant Formula (Batch/Batches Not Reported) | Positive | Type A |

**COMPLAINT**

5

17. Recalled products were sold through online marketplaces and were shipped to customers outside of the United States. Consumers worldwide should not use any ByHeart brand infant formula as all ByHeart products are included in the recall. Customer information provided by Amazon shows that a limited quantity of recalled ByHeart infant formula was distributed to Argentina, Brazil, Brunei, Canada, Chile, China, Colombia, Ecuador, Egypt, Hong Kong, Israel, Jamaica, Japan, Republic of Korea, Peru, Philippines, Romania, Singapore, South Africa, Thailand, and the British Virgin Islands.





**ByHeart's History**

18. ByHeart, Inc. is the parent company for three manufacturing / packaging facilities:

- Blendhouse LLC (Reading, PA), a manufacturing site.

- Blendhouse Allerton, LLC (Allerton, IA), a manufacturing site.

- Blendhouse Portland LLC (Portland, OR), a packaging site.

---

**COMPLAINT**

19. Of these, the Reading facility manufactures the infant formula base product, which is then blended and packaged at a different facility.

20. The Reading location achieved its FDA registration on April 28, 2022 and was subjected to an initial, and successful, FDA inspection in June 2022.

21. Two subsequent FDA inspections, however, found multiple problems. When child illnesses were linked to *Cronobacter sakazakii* and infant formula in 2022, the FDA chose to take an in-depth look at all the powdered infant formula manufacturing sites, including ByHeart's Reading facility. What they found was disturbing, resulting in two inspections—one in February 2023 and another in January 2024—being classified as "Official Action Indicated."

**Inspection – End Date February 17, 2023**

22. The FDA investigation team uncovered numerous problems, which were summarized in a Warning Letter, dated August 30, 2023. These included:

- Lack of process control system, as evidenced by a finding of *Cronobacter sakazakii* in a batch of ByHeart Whole Nutrition Infant Formula finished product. The infant formula base which was incorporated into that batch had been manufactured in continuous process from July 13, 2022 through August 23, 2022.

- Discrepancy between company's root cause analysis of the *Cronobacter* contamination problem and the conclusion of the third-party lab, in which the company blamed lab error and the lab denied that they had erred.

- Multiple notifications from third party lab of positive *Cronobacter sakazakii* findings from July 25, 2022 through August 27, 2022 within the processing environment.

- Two water events, during which water leaked into the manufacturing areas from outside.

**COMPLAINT**

**Inspection – End Date January 19, 2024**

23. The FDA conducted its next inspection eleven months later. According to information posted on the FDA's inspection data dashboard, investigators uncovered several serious problems. ByHeart:

- did not implement a system of production and in-process controls for an infant formula;

- did not maintain a building used in the manufacture, processing, packing or holding of infant formula in a clean and sanitary condition;

- did not minimize the potential for contamination of raw materials using appropriate measures;

- did not ensure that all surfaces that contacted ingredients, in-process materials and infant formula were cleaned and sanitized and maintained to protect infant formula from being contaminated by any source;

- did not monitor the temperature in a thermal processing equipment at a point where temperature control is necessary to prevent adulteration;

- did not exclude pests from your food plant to protect against contamination of food.

**What is Infant *Botulism*?**

24. Infant botulism is a rare but serious condition caused by the ingestion of *Clostridium botulinum* spores, which can grow in the intestines of infants (typically those under one year old) and produce a potent toxin. This condition usually occurs when infants consume contaminated foods, particularly honey, which is known to harbor spores. The spores can germinate in the immature gastrointestinal tract of infants, leading to toxin production and subsequent illness.

**Symptoms**

25. Symptoms of infant botulism typically appear between 12 to 36 hours after ingestion of the spores and may include:

- Constipation: Often the first sign, with stools that may become less frequent and harder.

- Weakness: A general lethargy or decreased muscle tone (hypotonia), often described as "floppy baby syndrome."

- Poor Feeding: Difficulty feeding or sucking.

- Cranial Nerve Dysfunction: This can lead to symptoms such as:

  - Weak cry or inadequate vocalization.

  - Difficulty swallowing.

  - Drooping eyelids or poor eye movement (ptosis).

- Respiratory Problems: In severe cases, difficulty breathing due to muscle weakness can occur.

- Weakness in Movement: Reduced ability to move arms and legs.

- Irritability or unusual crying.

**Treatment**

26. Hospitalization: Infants diagnosed with botulism often require hospitalization to monitor respiratory function and general health.

Supportive Care: Treatment primarily focuses on supportive measures such as:

- Nutritional support, often via intravenous fluids or feeding tubes if necessary.

- Monitoring and management of respiratory function; in some cases, mechanical ventilation may be required if breathing difficulties arise.

**COMPLAINT**

- *Botulism* Immune Globulin (BIG): In the United States, a specific treatment called BabyBIG (Botulism Immune Globulin) is administered to infants diagnosed with botulism. This treatment helps to neutralize the *Botulinum* toxin and can reduce the duration and severity of symptoms.

- Antibiotics: Antibiotics are not typically used for treating infant botulism as they do not affect the toxin once produced and can also promote toxin production by encouraging the growth of bacteria.

**Long-Term Prognosis**

27. The prognosis for infants with botulism is generally good, especially with early diagnosis and appropriate treatment. Most infants recover fully within a few weeks or months, but the recovery time can vary.

28. Recovery Time: Symptoms usually resolve over several weeks, but in some cases, full recovery can take months, especially regarding muscle strength and tone.

29. No Long-Term Disabilities: Most children do not experience long-term complications or disabilities if treated promptly and effectively.

30. Follow-Up: Regular follow-ups may be necessary to ensure continued recovery and to monitor for any residual muscle weakness.

**H.M.'s *Botulism* Illness**

31. H.M. was born on September 27, 2024. Plaintiffs began feeding H.M. ByHeart formula on February 17, 2025.

32. H.M.'s parents purchased the ByHeart formula from the Target store located at 1800 Empire Avenue, Burbank, CA 91504.

**COMPLAINT**
10

33. On March 5, 2025, Plaintiffs noticed that H.M. was unusually lethargic and refusing his bottle. He had been constipated for approximately one week, and Plaintiffs grew suspicious that the symptoms were related to the recently introduced ByHeart formula.

34. The following day, on March 6, 2025, H.M. briefly smiled, but his eyes appeared distant. His head tilted to one side, and his body felt limp. Plaintiffs contacted the pediatrician immediately.

35. Upon examining H.M., the pediatrician instructed Plaintiffs to take him to the hospital "immediately."

36. At the hospital, medical providers attempted to place an IV, but H.M. was so dehydrated that he required multiple needle sticks—five separate attempts—before an IV could be established. H.M. cried until he became too weak to do so. Physicians advised that he be transported to Children's Hospital Los Angeles for treatment for suspected infant botulism.

37. The next morning, on March 7, 2025, H.M. received the BabyBIG antitoxin. Despite treatment, his condition continued to decline. He required placement of a feeding tube.

38. H.M. remained hospitalized for twelve days. He required placement of a feeding tube.

39. The experience was devastating for the family. As his mother describes:

Twelve days of fear, sleepless nights, therapies, monitors beeping, doctors coming in with serious faces, and me sleeping upright in a chair next to his bed. Twelve days away from my other babies. My daughter, 7 at the time, broke down over and over. She still suffers today – paralyzing medical anxiety, constant worry for her brother. This trauma seeped into every corner of our family.

Neither my husband nor I could work. The financial stress grew heavier every day. I run a small, client-based business. Being gone for weeks destroyed it. I lost clients. Momentum. Stability. Eventually, after ten years, I had to close it permanently. I didn't just lose a business – I lost a part of myself. All because of what happened to [H.M.].

40. Since April 2025, H.M. has required weekly physical therapy for low muscle tone. He continues to suffer from severe constipation.

41. In the end, it was a parent's worst nightmare:

Since the recall, I've felt every emotion possible – rage, grief, vindication, heartbreak, fear. It destroys me to know more babies are suffering right now. Life does not go back to normal. [H.M.] requires daily suppositories just to have a bowel movement. Hearing him cry in pain, seeing blood every time… it ruins me. He was born a healthy, perfect baby boy. This changed everything. It changed him, it changed me, it changed my family. I lie aware worrying about long-term consequences. I worry about the future every day. I am grateful beyond words that [H.M.] survived. But gratitude doesn't erase what happened. It doesn't erase the trauma, the loss, the fear.

## CAUSES OF ACTION

### COUNT ONE

### STRICT PRODUCTS LIABILITY

42. Plaintiffs incorporate herein by reference the allegations in paragraphs 1–41.

43. At all relevant times, Defendants were the manufacturers, distributors, and/or sellers of the adulterated food product that is the subject of the action.

44. The adulterated food product that the Defendants manufactured, distributed, and/or sold was, at the time it left the Defendants' control, defective and unreasonably dangerous for its ordinary and expected use because it contained botulism spores.

45. The adulterated food product that the Defendants manufactured, distributed, and/or sold was delivered to the Plaintiffs without any change in its defective condition. The adulterated food product that the Defendants manufactured, distributed, and/or sold was used in the manner expected and intended, and was consumed by H.M.

46. The Defendants owed a duty of care to the Plaintiffs to design, manufacture, and/or sell food that was not adulterated, which was fit for human consumption, that was reasonably safe in

construction, and that was free of pathogenic bacteria or other substances injurious to human health. The Defendants breached this duty.

47. The Defendants owed a duty of care to the Plaintiffs to design, prepare, serve, and sell food that was fit for human consumption, and that was safe to the extent contemplated by a reasonable consumer. The Defendants breached this duty.

48. The Plaintiffs suffered injury and damages as a direct and proximate result of the defective and unreasonably dangerous condition of the adulterated food product that the Defendants manufactured, distributed, and/or sold.

## COUNT TWO

## BREACH OF WARRANTY

49. Plaintiffs incorporate herein by reference the allegations in paragraphs 1–48.

50. The Defendants are liable to the Plaintiffs for breaching express and implied warranties that they made regarding the adulterated food product that the Plaintiffs purchased. These express and implied warranties included the implied warranties of merchantability and/or fitness for a particular use. Specifically, the Defendants expressly warranted, through their sale of food to the public and by the statements and conduct of their employees and agents, that the food they prepared and sold was fit for human consumption and not otherwise adulterated or injurious to health.

51. The Plaintiffs allege that the botulism spore-contaminated food that the Defendants sold to them would not pass without exception in the trade and was therefore in breach of the implied warranty of merchantability.

---

**COMPLAINT**
13

52. The Plaintiffs allege that the botulism spore-contaminated food that the Defendants sold to them was not fit for the uses and purposes intended, *i.e.* human consumption, and that this product was therefore in breach of the implied warranty of fitness for its intended use.

53. As a direct and proximate cause of the Defendants' breach of warranties, as set forth above, the Plaintiffs sustained injuries and damages in an amount to be determined at trial.

**COUNT THREE**

**NEGLIGENCE**

54. Plaintiffs incorporate herein by reference the allegations in paragraphs 1–53.

55. The Defendants owed to the Plaintiffs a duty to use reasonable care in the manufacture, distribution, and sale of their food product, the breach of which duty would have prevented or eliminated the risk that the Defendants' food products would become contaminated with botulism spores or any other dangerous pathogen. The Defendants breached this duty.

56. The Defendants had a duty to comply with all statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of their food product, but failed to do so, and were therefore negligent. The Plaintiffs are among the class of persons designed to be protected by these statutes, laws, regulations, safety codes or provision pertaining to the manufacture, distribution, storage, and sale of similar food products.

57. The Defendants had a duty to properly supervise, train, and monitor their respective employees, and to ensure their compliance with all applicable statutes, laws, regulations, or safety codes pertaining to the manufacture, distribution, storage, and sale of similar food products, but they failed to do so, and were therefore negligent.

58. The Defendants had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, free of defects, and that otherwise complied with applicable

federal, state, and local laws, ordinances and regulations, and that were clean, free from adulteration, and safe for human consumption, but they failed to do so and were therefore negligent.

59. As a direct and proximate result of the Defendants' acts of negligence, the Plaintiffs sustained injuries and damages in an amount to be determined at trial.

## COUNT FOUR

### NEGLIGENCE *PER SE*

60. Plaintiffs incorporate herein by reference the allegations in paragraphs 1-59.

61. The Defendants had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of their food product, including the requirements of the Federal Food, Drug and Cosmetics Act (21 U.S.C. § 301 *et seq.*), and its California equivalents, including but not limited to the Sherman Food, Drug, and Cosmetic Laws (Cal. Health & Safety Code §§ 109875 *et seq.*).

62. The Defendants failed to comply with the provisions of the health and safety acts identified above, and, as a result, were negligent *per se* in their manufacture, distribution, and sale of food adulterated with botulism, a deadly pathogen.

63. As a direct and proximate result of conduct by the Defendants that was negligent *per se*, the Plaintiffs sustained injury and damages in an amount to be determined at trial.

## DAMAGES

64. The Plaintiffs have suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of the Defendants, in an amount that shall be fully proven at the time of trial. These damages include but are not limited to damages for general pain and suffering, both past and future; damages for loss of enjoyment of life,

both past and future; medical and medical related expenses, both past and future; loss of wages, both past and future; emotional distress, past and future; pharmaceutical expenses, both past and future; and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for the following relief:

65. That the Court award Plaintiffs judgment against Defendants, in such sums as shall be determined to fully and fairly compensate the Plaintiffs for all general, special, incidental and consequential damages incurred, or to be incurred, as the direct and proximate result of the acts and omissions of Defendants, in an amount to be proven at trial.

66. That the Court award Plaintiffs their costs, disbursements and reasonable attorneys' fees incurred.

67. That the Court award Plaintiffs the opportunity to amend or modify the provisions of this complaint as necessary or appropriate after additional or further discovery is completed in this matter, and after all appropriate parties have been served; and

68. That the Court award such other and further relief as it deems necessary and proper in the circumstances.

## JURY DEMAND

69. Plaintiffs demand a trial by jury on all issues so triable with the maximum number of jurors permitted by law.

RESPECTFULLY SUBMITTED this 22nd day of December 2025.

Respectfully submitted,

**QUIRK LAW FIRM LLP**

By:      _/s/ Trevor Quirk_____
Trevor Quirk, SBN 241626
Attorney for Plaintiff
877 South Victoria Avenue, Suite 111
Ventura, CA 93003
Telephone: (805) 620-7645
tmq@qlflaw.com

**MARLER CLARK INC., PS**

By:   /s/*William D. Marler*
WILLIAM D. MARLER, WSBA #17233
*Pro hac vice forthcoming*
Attorneys for Plaintiff
180 Olympic Drive S.E.
Bainbridge Island, Washington 98110
Telephone: (206) 346-1888
bmarler@marlerclark.com